GENEVRA HEMAN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

SHELBY L. HEMAN TRUST U/W, GENEVRA HEMAN AND MERCANTILE TRUST COMPANY, TRUSTEES, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 63857, 63899. Filed May 29, 1959.

*Donald E. Fahey, Esq.*, for the petitioners.
*Donald W. Wolf, Esq.*, for the respondent.

BRUCE, *Judge:* These consolidated proceedings involve deficiencies in income tax and additions thereto in the amounts and for the years as set forth below:

GENEVRA HEMAN, DOCKET No. 63857

| Year | Deficiency | Addition to tax, sec. 294(d)(1)(A) | Addition to tax, sec. 294(d)(2) |
|---|---|---|---|
| 1950 | $1,928.85 | $195.12 | $130.07 |

SHELBY L. HEMAN TRUST U/W GENEVRA HEMAN AND MERCANTILE TRUST CO., TRUSTEES, DOCKET No. 63899

| Taxable period | Deficiency | Addition to tax, sec. 291(a) |
|---|---|---|
| June 27, 1950 to Dec. 31, 1950 | $5,361.06 | $1,340.27 |

The issues for decision are: (1) Whether the cancellation of decedent stockholder's debt upon the redemption of 250 shares of preferred stock of Trinidad Asphalt Manufacturing Company was essentially equivalent to a taxable dividend under section 115(g) of the 1939 Code and therefore taxable to the decedent's widow and to the trust created under the decedent's will; (2) whether decedent's widow is liable for an addition to tax under section 294(d)(2); and (3) whether the trust is liable for an addition to tax under section 291(a). The addition to the tax of decedent's widow under section 294(d)(1)(A) was conceded in the petition.

### FINDINGS OF FACT.

Some of the facts were stipulated, are so found, and are incorporated herein by this reference.

Genevra Heman (hereinafter referred to as decedent's widow) is the widow of Shelby L. Heman (hereinafter referred to as decedent). During 1950 she resided in Clayton, St. Louis County, Missouri, and filed her Federal individual income tax return with the collector of internal revenue for the first district of Missouri. She did not file a declaration of estimated tax for the year 1950.

Genevra Heman and the Mercantile Trust Co. are fiduciaries (duly appointed and acting executors and trustees of trust under decedent's will) with principal office in St. Louis, Missouri. For the year 1950 the Heman Trust did not file a fiduciary income tax return.

The decedent died on June 6, 1947. During his lifetime, decedent and his brother, John C. Heman (hereinafter sometimes referred to

as John), owned all of the outstanding preferred stock, 7 per cent noncumulative, equally and all except 3 qualifying shares of the outstanding common stock of Trinidad Asphalt Manufacturing Co. (hereinafter referred to as Trinidad).

Trinidad was duly organized under the laws of the State of Missouri on January 15, 1898.

Immediately before decedent's death, he and his brother John each owned 250 shares of Trinidad preferred stock and 474 shares of Trinidad common stock in their individual names and 49 shares of common stock were in their joint names, with right of survivorship. Upon decedent's death the 49 shares became the property of John.

Decedent's estate consisted primarily of his above-described holdings in Trinidad.

At the time of decedent's death, he and John were indebted to Trinidad on open account in the respective amounts of $26,395.21 and $43,301.26.

On June 21, 1948, Trinidad filed a claim against the Estate of Shelby L. Heman (hereinafter sometimes referred to as the estate) in the amount of $26,395.21. The claim was allowed on January 26, 1950, by the Probate Court of St. Louis County, Missouri, in the amount of $26,014.81.

On January 20, 1950, Trinidad had agreed with the executors of the estate that should the Probate Court allow Trinidad's claim in an amount in excess of $24,000, Trinidad would accept the 250 shares of preferred stock then in possession of the executors in full satisfaction and payment of Trinidad's claim against the estate.

The agreement between Trinidad and the executors included the following provisions:

WHEREAS, the estate of Shelby L. Heman does not have sufficient liquid assets or cash with which to pay the above-mentioned claim of the Company; and,

WHEREAS, both the Company and the Executors are desirous of disposing of the claim of the Company now pending in the Probate Court of St. Louis County, Missouri, * * *

Of February 24, 1950, a petition by the estate for authority to transfer the preferred stock to Trinidad in payment of the claim was filed with the Probate Court and granted after a hearing, whereupon the stock was transferred to Trinidad.

Immediately before the redemption of the preferred stock of Trinidad held by the estate, the outstanding stock of Trinidad was held as follows:

| Common stock: | Shares |
|---|---|
| John C. Heman | 523 |
| Estate of Shelby L. Heman | 474 |
| Qualifying shares | 3 |
| | 1,000 |

| Preferred stock, 7 per cent noncumulative: | Shares |
|---|---|
| John C. Heman | 250 |
| Estate of Shelby L. Heman | 250 |
| | 500 |

Immediately after the redemption of the preferred stock of Trinidad, the outstanding stock of Trinidad was held as follows:

| Common stock: | Shares |
|---|---|
| John C. Heman | 523 |
| Estate of Shelby L. Heman | 474 |
| Qualifying shares | 3 |
| | 1,000 |
| Preferred stock, 7 per cent noncumulative: | |
| John C. Heman | 250 |
| Trinidad, treasury stock | 250 |
| | 500 |

On January 20, 1950, the same date on which the agreement between Trinidad and the executors of the estate was made, John C. Heman entered into an agreement with Trinidad to transfer his 250 shares of preferred stock to Trinidad in three annual installments in partial satisfaction of his indebtedness to Trinidad. John agreed to deposit with Trinidad the 250 shares of preferred stock as security for his performance of the agreement. If he failed to perform his part of the agreement on the dates and in the amounts set forth in the agreement, Trinidad had the right and authority to transfer on its books to itself as treasury stock the number of shares due under the agreement. Furthermore, John waived and renounced all rights to receive dividends or other payments of any type due or to become due on the preferred stock of Trinidad.

The pertinent provisions of the agreement between John C. Heman and Trinidad are as follows:

WHEREAS, The Company and the First Party, as well as the other stockholders of the Company, are all desirous of having this indebtedness of the First Party reduced and finally satisfied as soon as possible; and

\* \* \* \* \* \* \*

WHEREAS, by agreement dated January 20th 1950, the Company and the Executors of the estate of Shelby L. Heman, deceased, entered into an agreement whereby the Company agreed to accept shares of its Preferred stock in satisfaction of a claim of the Company against the Estate of Shelby L. Heman, deceased, which claim has been filed in the Probate Court, St. Louis County, Missouri.

Now, THEREFORE, for the considerations hereinafter set forth the parties agree as follows:

1. The First Party agrees to surrender to the Company in three installments, due as hereinafter provided, the Preferred stock of the First Party, in partial

satisfaction of the indebtedness of the First Party to the Company. The First Party agrees to so surrender to the Company on or before January 10, 1951, eighty-three shares of said Preferred stock, and further, said First Party agrees to so surrender to the Company on January 9, 1952, an additional eighty-three shares of Preferred stock, and First Party agrees to so surrender to the Company on January 8, 1953, another eighty-four shares of Preferred stock. All such Preferred stock transferred to the Company by the First Party shall be applied against the indebtedness of the First Party to the Company. It is agreed by the parties that said Preferred stock when transferred to the Company pursuant to this agreement shall be considered as having a value of $105.58 per share. The Company covenants and agrees that the Preferred stock received by it pursuant to this agreement will be held by the Company as Treasury stock, and the same will not be canceled, reissued or sold except with the written consent of the holders of seventy-five percent of the authorized and outstanding common stock of the Company.

2. The First Party, as security for his performance of this agreement, agrees to deposit with the Company two hundred fifty shares of Preferred stock, and, should the First Party fail to perform his part of this agreement on the dates named in paragraph 1 hereof, the Company shall have the right and authority to transfer on its books to the Company as Treasury stock the number of shares of stock due hereunder from the First Party.

3. The First Party hereby waives and renounces all rights to receive dividends or other payments of any type due or to become due on said Preferred stock, to the end that no dividends on Preferred stock shall be due or payable to the First Party directly or indirectly after the date of this agreement.

4. Under contract dated January 20th, 1950, the Company and the Executors of Shelby L. Heman, deceased, made an agreement whereby the Company accepted shares of the Preferred stock of the Company from said Executors in full payment of a claim of the Company filed June 21, 1948, in the Probate Court, St. Louis County, Missouri, against the Estate of Shelby L. Heman, deceased. It is agreed by the parties hereto that said contract of January 20th, 1950, forms a part of the consideration of this agreement, and further, the Executors of Shelby L. Heman, deceased, or either of them, and after their discharge any holder of Common stock of the Company, shall be considered benefited by and a party to this agreement and may enforce this agreement, or sue for damages for its breach in a proper court of law or equity.

The price allowed per share in the agreement between the executors of decedent's estate and Trinidad was virtually identical with the price per share resulting from the agreement between Trinidad and John C. Heman.

Trinidad has continued in its business in St. Louis, Missouri, since the redemption of the preferred stock. The preferred stock redeemed by Trinidad has been held as treasury stock.

The only dividends paid on the preferred stock prior to redemption were in 1936 and 1947, in the amount of $3,500 in each year.

For the years ended December 31, 1950, 1951, and 1952, Trinidad's fixed assets less reserves for depreciation were as follows:

|  | Year ended Dec. 31— | | |
|---|---|---|---|
|  | 1950 | 1951 | 1952 |
| Machinery and equipment | $160,112.72 | $196,102.19 | $200,518.80 |
| Less: Reserve for depreciation | 147,010.05 | 150,326.24 | 131,920.58 |
|  | 13,102.67 | 45,775.95 | 68,598.22 |
| Automotive equipment | 43,837.43 | 55,897.25 | 73,742.82 |
| Less: Reserve for depreciation | 31,905.51 | 28,061.78 | 30,938.15 |
|  | 11,931.92 | 27,835.47 | 42,804.67 |
| Office equipment | 1,334.01 | 2,235.07 | 3,663.12 |
| Less: Reserve for depreciation | 669.05 | 789.24 | 937.72 |
|  | 664.96 | 1,445.83 | 2,725.40 |
| Total: Net fixed assets | 25,699.55 | 75,057.25 | 114,128.29 |

The amount of Trinidad's net profit before and after taxes for the years 1947 to 1952, inclusive, was as follows:

| Year | Net profit (loss) before taxes | Net profit after taxes |
|---|---|---|
| 1947 | $5,786.44 | $5,672.88 |
| 1948 | 17,833.19 | 17,553.34 |
| 1949 | (13,471.09) | --------- |
| 1950 | (23,993.83) | --------- |
| 1951 | 85,507.20 | 53,686.56 |
| 1952 | 52,955.36 | 23,206.59 |

The amount of Trinidad's surplus (including reserves for contingencies) available for dividends for the years 1947 to 1952, inclusive, was as follows:

| | |
|---|---|
| 1947 | $126,668.03 |
| 1948 | 139,221.37 |
| 1949 | 122,053.85 |
| 1950 | 98,060.02 |
| 1951 | 139,981.98 |
| 1952 | 150,004.93 |

The gross income of Trinidad for the years 1947 to 1952, inclusive, was as follows:

| | |
|---|---|
| 1947 | $36,005.19 |
| 1948 | 43,455.20 |
| 1949 | 7,749.18 |
| 1950 | 14,775.72 |
| 1951 | 120,923.76 |
| 1952 | 100,775.94 |

Trinidad's cash on hand and in banks as of December 31, 1950, after redemption of the preferred stock, was $93,461.52.

Upon final distribution and settlement of the estate according to the terms of the decedent's last will and testament and according to the laws of the State of Missouri, said estate was distributed one-third to his widow and two-thirds to the trustees of a testamentary trust for the benefit of decedent's minor son and daughter.

Respondent determined that Trinidad's cancellation of decedent stockholder's indebtedness was essentially equivalent to a dividend and resulted in ordinary income in 1950 to the Estate of Shelby L. Heman in the amount of $26,014.81. As a consequence, the net income of such estate was $25,691.67. Respondent determined that one-third of this net income, or $8,563.89, and two-thirds, or $17,127.78, was distributable to and includible in the net income of decedent's widow and the Heman Trust, respectively, under the provisions of section 162(c).

Decedent's widow filed her individual income tax return for the year 1950 showing a balance of tax due of $239. Respondent determined that her tax liability for the year 1950 was $1,928.85.

The transfer in 1950 to Trinidad of 250 shares of its preferred stock by the Estate of Shelby L. Heman in satisfaction of the estate's indebtedness to Trinidad was, under the facts and circumstances, "essentially equivalent to the distribution of a taxable dividend" under section 115(g).

OPINION.

The primary issue is whether the cancellation of decedent stockholder's indebtedness to Trinidad, a closely held corporation, upon the redemption of his 250 shares of preferred stock is essentially equivalent to a taxable dividend within the purview of section 115(g) of the 1939 Code[1] and therefore taxable as ordinary income to the decedent's widow and to the Heman Trust, both distributees under decedent's will.

At the time of decedent's death, he and his brother John each owned 250 shares of 7 per cent noncumulative preferred stock and 474 shares of common stock in Trinidad. They also held 49 shares of Trinidad common stock in their joint names with right of survivorship. The only other Trinidad stock outstanding were 3 qualifying shares of common stock. Decedent's individually owned stock passed to his estate after his death.

Decedent and John were indebted to Trinidad on open account in the amounts of $26,395.21 and $43,301.26, respectively. Trinidad filed a claim against decedent's estate in the amount of $26,395.21, which was allowed by the Probate Court in the amount of $26,014.81. A few days before the allowance of the claim, the estate and Trinidad had entered into an agreement whereby the estate agreed to surrender its

---

[1] SEC. 115. DISTRIBUTIONS BY CORPORATIONS.

(g) REDEMPTION OF STOCK.—

(1) IN GENERAL.—If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend.

250 shares of preferred stock in satisfaction and payment of Trinidad's claim against the estate. On the same date, John and Trinidad entered into a similar agreement, under which he agreed to surrender his 250 shares of preferred stock in three annual installments (but, in effect, surrendered all material rights to the entire 250 shares as of the date of the agreement) in partial satisfaction of John's indebtedness to Trinidad.

Upon final settlement and distribution the estate was distributed one-third to decedent's widow and two-thirds to the Heman Trust (which had been created under decedent's will) and respondent determined that the net income of those distributees should be increased accordingly under section 162(c).[2]

Under the above facts and circumstances we agree with respondent's determination that Trinidad's cancellation of decedent stockholder's indebtedness was essentially equivalent to the distribution of a taxable dividend under section 115(g) and consequently was taxable as ordinary income to decedent's widow and the Heman Trust, both distributees under decedent's will, under section 162(c).

Section 115(c) provides that "[a]mounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock, and amounts distributed in partial liquidation of a corporation shall be treated as in part or full payment in exchange for the stock." Section 115(i) provides that "the term 'amounts distributed in partial liquidation' means a distribution by a corporation in complete cancellation or redemption of a part of its stock, or one of a series of distributions in complete cancellation or redemption of all or a portion of its stock." Section 115(g) constitutes an exception to the foregoing provisions where the "cancellation or redemption in whole or in part [is] essentially equivalent to the distribution of a taxable dividend."

Whether or not a particular transaction involves the essential equivalent of a taxable dividend is a question of fact. *Ferro* v. *Commissioner*, (C.A. 3, 1957) 242 F. 2d 838, affirming a Memorandum Opinion of this Court;[3] Regs. 111, sec. 29.115-9. There is no sole decisive test, *Flanagan* v. *Helvering*, (C.A. D.C., 1940), 116 F. 2d 937, affirming a Memorandum Opinion of this Court, but a number

---

[2] SEC. 162. NET INCOME.

(c) In the case of income received by estates of deceased persons during the period of administration or settlement of the estates, and in the case of income which, in the discretion of the fiduciary, may be either distributed to the beneficiary or accumulated, there shall be allowed as an additional deduction in computing the net income of the estate or trust the amount of the income of the estate or trust for its taxable year, which is properly paid or credited during such year to any legatee, heir, or beneficiary, but the amount so allowed as a deduction shall be included in computing the net income of the legatee, heir, or beneficiary;

[3] See cases cited in *Ferro* v. *Commissioner*, supra footnote 2, at 841. Apparently all Circuit Courts of Appeals, except the Second, consider the applicability of section 115(g) a question of fact.

of judicial criteria or guideposts have been determinative in placing a transaction within section 115(g).

Among these criteria are: The presence or absence of a bona fide corporate business purpose; whether the action was initiated by the corporation or by the shareholders; did the corporation adopt any plan or policy of contraction, or did the transaction result in a contraction of the corporation's business; did the corporation continue to operate at a profit; whether the transaction resulted in any substantial change in the proportionate ownership of stock held by the shareholders; what were the amounts, frequency, and significance of dividends paid in the past; was there a sufficient accumulation of earned surplus to cover the distribution, or was it partly from capital. *Flanagan* v. *Helvering, supra; Earle* v. *Woodlaw*, (C.A. 9, 1957) 245 F. 2d 119, certiorari denied 354 U.S. 942.

Upon an application of all the above criteria to the facts and circumstances of the instant case we think that Trinidad's cancellation of decedent stockholder's indebtedness was essentially equivalent to a taxable dividend to the petitioners in these consolidated cases.

Due to the nature of the agreements between petitioners and Trinidad, and petitioners' retention of their common stock holdings in Trinidad, the ownership and control of Trinidad remained substantially the same after the redemption of the estate's preferred stock. The agreement between John and Trinidad, signed the same day as the agreement between the estate and Trinidad, provided for the cancellation of a portion of John's debt to Trinidad upon surrender of his 250 shares of preferred stock. The transfer of the stock was to take place in three annual installments, but since Trinidad held the shares as security with the right to transfer them on its books to itself as treasury stock in the event of John's default and since John waived all rights to receive dividends or other payments thereon, the total effect of the agreement was to leave the ownership and control of Trinidad unaltered.

Trinidad did not manifest any policy of contraction. There exists no evidence that any plan of contraction was ever adopted by the corporation. The increase in surplus and fixed assets during the years following the stock redemption is indicative of an expansion, rather than a contraction, of business activity.

Trinidad's past dividend policy was meager and infrequent. The only dividends paid on the preferred stock prior to the redemption were in 1936 and 1947, in the amount of $3,500 in each year.

At the time of the redemption Trinidad had accumulated earnings and profits available for the payment of dividends far in excess of the amount of its debt cancellation. Petitioners' contention that $50,000 of the surplus was nondistributable goodwill and that consequently there was insufficient surplus for the distribution here in

question is without merit. The record does not indicate that any portion of the surplus account consisted of goodwill.

There is no substantial evidence showing either a bona fide corporate business purpose or that the initiative for the distribution came from the corporation. Indeed, the record indicates that the estate lacked liquid assets to pay Trinidad's claim and that consequently the transaction was dictated by the estate's needs rather than by any bona fide corporate business purpose.

Petitioners contend that there was a bona fide business purpose in the instant transaction, i.e., the satisfaction of the claim which had been allowed by the Probate Court. We feel that there was, at the least, a strong personal motive on the part of decedent's estate to eradicate its debts in the most feasible manner. We recognize that the benefit to be gained from the cancellation of such indebtedness could be considered mutual. However, even assuming such a mutual advantage could be considered sufficient basis for a minimal bona fide corporate business purpose, this, without more, would not preclude dividend equivalence.

Under the "net effect" test all factors must be considered. "The net effect of the distribution rather than the motives and plans of the taxpayer or his corporation, is the fundamental question in administering section 115 (g)." *Flanagan* v. *Helvering, supra* at 939.

The mere existence of a single bona fide business purpose will not of itself conclusively determine that the transaction does not result in the essential equivalent to a taxable dividend. *United States* v. *Fewell*, (C.A. 5, 1958) 255 F. 2d 496; *Kessner* v. *Commissioner*, (C.A. 3, 1957) 248 F. 2d 943, affirming 26 T.C. 1046.

Thus, by all of the tests the present transaction is governed by section 115 (g). There was no contraction of corporate activities. There was no alteration in the proportionate ownership or control of the shareholders. The past dividend policy was meager. The amount of surplus available for dividends was ample. There was no corporate business purpose sufficiently material and substantial to offset the other significant criteria of a taxable dividend. The only practical effect of the redemption was to cancel shareholders' debts as though a pro rata dividend in cash had been declared and paid.

Petitioners further maintain that since the preferred stock in question was subsequently held as treasury stock the instant transaction does not come within the purview of section 115 (g) which requires either the "cancellation or redemption" of stock. Since the 250 shares of preferred stock were not canceled the question arises whether the instant transaction comes within the statutory meaning of "redemption."

Section 115 (g) employs the pertinent words in the alternative, to wit, "cancellation or redemption." From this it may be assumed

that their meaning differs, and that the meaning of the latter is less formal than that of the former. The term "redemption" is certainly broad enough to cover the instant transaction. The stock was reacquired without any intent to reissue. Although the stock was not formally retired, it was put to rest in the company's treasury as though the shares had been formally reduced. "If it should be held that taxpayers can avoid the terms of the statute by the simple device of selling their stock to the corporation and having it held as treasury stock, the purpose of the statute to prevent the evasion of taxes upon corporate dividends would be completely frustrated." *Wall* v. *United States*, (C.A. 4, 1947) 164 F. 2d 462, 465. Accord, *Keefe* v. *Cote*, (C.A. 1, 1954) 213 F. 2d 651; *Boyle* v. *Commissioner*, (C.A. 3, 1950) 187 F. 2d 557, affirming 14 T.C. 1382, certiorari denied 342 U.S. 817; *Robinson* v. *Commissioner*, (C.A. 5, 1934) 69 F. 2d 972. Contra, *Alpers* v. *Commissioner*, (C.A. 2, 1942) 126 F. 2d 58. But see, dissent by L. Hand, *J.*, in *Alpers* v. *Commissioner*, *supra* at 61.

Petitioners suggest certain other criteria as governing the applicability of section 115(g): The financial ability of the stockholder to pay his debt to the corporation by means other than the stock redemption; whether the transaction involved cash or property, or merely a book transaction; whether the stockholder was an estate whose assets consisted largely of the stock of the corporation; and whether the transaction was initiated by the majority or minority stockholders. Petitioners cite no authority in support of these alleged criteria and, with the exception of any indirect bearing they may have on the more substantial judicial criteria discussed previously, we find them to be without merit under the facts and circumstances of this case.

The second issue concerns the additions to the tax of decedent's widow for substantial underestimation of tax within the meaning of section 294(d)(2). Decedent's widow has conceded failure to file a declaration of estimated tax without reasonable cause. In *Walter H. Kaltreider*, 28 T.C. 121, 126, affd. (C.A. 3, 1958) 255 F. 2d 833, we held that "[w]here no declaration of estimated tax has been filed, the estimate is deemed to be zero and the addition to the tax provided in section 294(d)(2) for substantial underestimate of estimated tax is mandatory." Petitioner in this case has neither pleaded nor argued the question of whether the addition to tax for substantial underestimation of tax under section 294(d)(2) may be imposed as well as the addition to tax for failure to file a declaration of estimated tax under section 294(d)(1)(A). This Court has consistently allowed concurrent additions to tax under these two sections. *G. E. Fuller*, 20 T.C. 308, affirmed on other grounds (C.A. 10, 1954) 213 F. 2d 102; *Luerana Pigman*, 31 T.C. 356. The Courts of Appeals for the Third, Fifth, and Ninth Circuits are in accord. *Abbott* v. *Commissioner*, (C.A. 3, 1958) 258 F. 2d 537, affirming 28 T.C. 795; *Patchen* v. *Com-*

*missioner*, (C.A. 5, 1958) 258 F. 2d 544, affirming as to this issue 27 T.C. 592; *Hansen* v. *Commissioner*, (C.A. 9, 1958) 258 F. 2d 585, affirming as to this issue a Memorandum Opinion of this Court, certiorari granted on other grounds 358 U.S. 879. The Court of Appeals for the Eighth Circuit has not directly considered this issue. But see *Owen* v. *United States*, (D. Neb., 1955) 134 F. Supp. 31, modified on another point sub nom. *Knop* v. *United States*, (C.A. 8, 1956) 234 F. 2d 760. The Sixth Circuit Court of Appeals has taken a position contrary to that of the Tax Court. *Acker* v. *Commissioner*, (C.A. 6, 1958) 258 F. 2d 568, affirming in part and reversing in part a Memorandum Opinion of this Court. The *Acker* case is presently pending on writ of certiorari before the Supreme Court, 358 U.S. 940. With due respect to the Court of Appeals for the Sixth Circuit, we follow the previous decisions of this Court and those of the Courts of Appeals for the Third, Fifth, and Ninth Circuits. See *Arthur L. Lawrence*, 27 T.C. 713, reversed on other grounds (C.A. 9) 258 F. 2d 562.

The third issue concerns the addition to tax of the Heman Trust for failure to file a fiduciary income tax return for the year 1950 as required by section 291(a) which provides for the imposition of additions to tax "in case of any failure to make and file return * * * unless it is shown that such failure is due to reasonable cause and not due to willful neglect." Petitioner has the burden of showing that the failure to file the required return was due to reasonable cause. *Wm. J. Lemp Brewing Co.*, 18 T.C. 586.

In the absence of evidence showing reliance on the advice of competent counsel, mere mistaken belief that no return was required under the statute because of lack of income does not constitute reasonable cause for noncompliance. *Beck Chemical Equipment Corporation*, 27 T.C. 840.

*Decisions will be entered for the respondent.*